Gerber's Estate.

Argued October 3, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, LINN, STERN and BARNES, JJ.

110

[REDACTED]

*George B. Berger,* with him *Harbaugh Miller, Albert O. Olson* and *Donald Thompson,* for appellant.

*William R. Scott,* with him *Robert C. McEwan* and *Hepburn & Norris,* for appellees.

OPINION BY MR. JUSTICE LINN, November 27, 1939:

Appellant, in 1931, under a trust created by his father, was entitled to income during his mother's life and to ½ the corpus on her death. She died December 10, 1937. The trustee then filed its account. From the audit statement it appeared that appellant had assigned his interest in the corpus—a sum in the neighborhood of $25,000—and that the assignees were entitled under the assignment. No exceptions were filed to the account but before the amount for distribution had become payable to appellant's assignees, the appellants on March 22, 1938, filed a petition for a citation, directed, inter alia, to appellees, to show cause why the audit "should not be reopened and your petitioner admitted to a defense against the claim of the . . . assignees, so that the proper amount to which said Trustees are entitled may be determined." A responsive answer was filed. The case came on for hearing November 30, 1938, when evidence of witnesses was received. In addition to that evidence the parties filed a stipulation of facts. The learned court below, after hearing, dismissed the petition and confirmed the decree of distribution. This appeal is from that decree.

The appellees, National Iron Bank of Pottstown, hereafter referred to as the bank, and Edward J. Storb, are trustees under a deed of trust dated September 1, 1931 (executed September 14, 1931) made by appellant to secure the payment of twenty $1,000 bonds described in the stipulation of facts as "negotiable bearer bonds, which he executed simultaneously" with the deed of trust. In his petition to reopen the audit, he made averments of fact which, as he declared, "rendered the transaction usurious and a fraud upon" him. The sixth paragraph of the petition states: "Your petitioner avers that by reason of the nature of the transaction the National Iron Bank of Pottstown, Pa. and Edward J. Storb, Trustees, are not entitled to any amount in distribution of this estate greater than the amount actually paid to your petitioner, together with such amount as may properly and reasonably have been paid for the purchase of an annuity which would provide for regular payments of interest upon his bonds, and less interest, from the time they withheld the same, on the amounts they unlawfully withheld from your petitioner."

On September 16, 1931, two days after they were issued, the bank sold the bonds to J. B. Lessig, who held them at the time of trial. The learned court below decided the bonds were negotiable, that Lessig was a holder in due course, and that appellant could not, in this proceeding, plead set-off under the usury statute; that the court had "no jurisdiction over the purchasers of the bonds. If the bank made a loan to Gerber and was paid usuriously in consummating the transaction, the remedy is not in this proceeding: *Barnet v. National Bank*, 98 U. S. 555. There it is held that a separate action is the remedy."

The transaction may be summarized for present purposes as follows: In August, 1931, appellant was in negotiation with the Chatham Discount Company (or C. W. Scherer, referred to later in note 2) in New York for a loan and was by it informed in writing of terms on

which a loan might be made, part of the writing being quoted below.[1]

In consequence or as part of the negotiations, Herbert P. Queal, an attorney of New York, representing the appellant "took up" (in the words of the stipulation) "the matter of the loan with the National Iron Bank of Pottstown, and was by it informed of the terms and conditions under which it would act as corporate trustee under the proposed issue of bonds, and which are set forth in the second paragraph of said letter of August 17, 1931." (The letter is quoted in note 1.)

Appellant signed a letter, dated August 20, 1931, addressed to Mr. Queal, authorizing him "to obtain trustees for the said bond issue, to procure brokers to sell my bonds, and to prepare all papers in connection with the said matter." [2]

---

[1] "A loan of about Twenty Thousand Dollars ($20,000.00) can be arranged out of which sum an annuity would have to be purchased to cover the interest of six per cent on said loan which amounts to Twelve Hundred Dollars ($1,200.00) per annum. This annuity will cost about Nine Thousand Two Hundred and Twenty-five Dollars ($9,225.00) and covers the interest until your mother deceases regardless of how long she lives.

"The cost of the above loan will be about Forty-eight Hundred Dollars ($4,800.00). This includes our commission.

"This would leave about Six Thousand Dollars coming to you at time of closing. These figures are based on the assumption that you have a vested interest in the estate, and no insurance is required."

[2] This letter continued as follows:

"For your service I agree to pay you a fee of $1,400. I also agree to pay the following expenses:

| | |
|---|---|
| "To brokers for selling the said bonds and floating the bond issue, 10% or .............................. | $2,000.00 |
| "To C. W. Scherer, for commissions, 5% or .......... | 1,000.00 |
| "For an annuity in the sum of $1,200 per year, to pay the interest on the said bonds .................. | 9,225.60 |
| "For fees of the trustees under said deed of trust, approximately ...................................... | 150.00 |

The 4th stipulation of facts states: "4. Neither Edward J. Storb, nor the National Iron Bank of Pottstown, at any time prior to said negotiations or agreements between said Emil Gerber, Jr., and either said Queal, or said Scherer, had any dealings with said Emil Gerber, Jr., and neither Edward J. Storb, nor the National Iron Bank of Pottstown, had any knowledge of any commitments, obligations or contracts which Emil Gerber, Jr., had, either with said Queal, said Scherer, or any other person, relative to said issue of bonds. Neither said Storb, nor said bank, had any interest in, nor at any time received any part of, any of the payments made by Emil Gerber, Jr., either to said Queal, or said Scherer, or either of them."

The parties met in the office of the bank's counsel in Philadelphia on September 14th at which time Queal and one Walton S. Rhoads were present. At that time the assignment of appellant's interest in his father's estate was delivered and he received from the bank a certified check for $20,000.00. The stipulation states that on the same day the appellant[3] "drew the following

---

"For fees of the local attorneys of the trustees, approximately ........................................ 200.00
"For printing the bonds, approximately ............. 100.00

"I also agree to pay your incidental and office expenses, estimated at $27.50, and your fare to Philadelphia for the closing of the loan.

"I agree to execute all papers and do all things necessary to carry through the loan, and to attend at the time and place you shall set for the closing thereof."

[3] Appellant's description of what happened at the meeting in Philadelphia on September 14th is quoted as follows: "A. I went to the office of Hepburn & Norris on September 14, 1931, to close the deal. I met Mr. Hepburn, who introduced me to Mr. Storb, president of the Iron Bank of Pottstown, Mr. Queal or Mr. Murphy of New York was there, I don't know which. I met Mr. Rhoads, and there were several others present. They put before me a paper addressed to Mr. Rhoads, covering the two thousand dollars for brokerage fees. I was told to sign this paper, which I did and

checks against the $20,000.00 of proceeds of said bonds, which he had deposited in the National Iron Bank of Pottstown:

"To the order of Walton S. Rhoads, endorsed by Walton S. Rhoads ........................................ $2,000.00
To the order of Herbert P. Queal, endorsed by Herbert P. Queal ........................................ 1,536.44
To the order of Treasurer of the Penn Mutual Life Insurance Co., endorsed Penn Mutual Life Insurance Co., Paul Alexander, Treasurer .................. 9,913.68
To the order of National Iron Bank of Pottstown, endorsed by National Iron Bank of Pottstown ....... 100.00
Hepburn & Norris, endorsed by Hepburn & Norris ... 202.15
C. W. Scherer, endorsed by C. W. Scherer .......... 1,050.78
Emil Gerber, Jr., endorsed by Emil Gerber, Jr., and L. R. Knapp ................................... 1,000.00
Emil Gerber, Jr., endorsed by Emil Gerber, Jr. ...... 4,196.95

$20,000.00'

The payment of $2,000 to Rhoads was made pursuant to a letter signed by appellant in the following words:
"September 14, 1931.

"I, Emil Gerber, Jr., hereby employ Walton S. Rhoads as broker to negotiate and sell for me twenty one thousand dollar ($1,000.00) bonds issued under my deed of trust with The National Iron Bank, of Pottstown, Pennsylvania, and Edward J. Storb, trustees, dated Sep-

---

returned it to them. They then put before me a check for $20,000.00, payable to my order, from the National Iron Bank of Pottstown. I was told to endorse those, which I did and passed it back to them. They handed this check to Mr. Storb. Next they put before me six checks covering the expenses of defraying the loan. I was told to sign those checks, which I did, and returned them to them. I was then given a check for the balance, which was my share, and I was ready to go home. They asked me if I would accompany one of their representatives to the insurance office to secure a policy. It being near closing time we hurriedly took a taxi and went to the insurance office where the representative gave them my check for $9,913.00, and I signed a receipt. The policy was turned over to the representative, and I started home with my check."

tember 1, 1931, and for his services as said broker, I agree to pay him at the closing of said bond issue ten per cent (10%) of the face value of said bonds, or $2,000.00."

Mr. Rhoads did not procure a purchaser of the bonds; the bank, on September 16th, sold and delivered them to Mr. Lessig as has been stated. Rhoads, having made no sale of the bonds, afterward paid to the bank $1,990.00 out of the $2,000.00 paid to him by appellant.

The vice-president of the bank, being asked when the bank received the $1,990.00 from Mr. Rhoads, testified that he did not recall exactly when; "it may have been the next day or three or four days later, sometime subsequent."

The payments to Queal, Scherer, Hepburn & Norris, and the $100 trustee fee to the bank are not questioned. Appellant's position is that the $2,000 paid to Rhoads, added to the 6% interest secured by the annuity, made the loan usurious under the National Banking Act, thereby allowing appellant now to claim a forfeiture of the interest reserved by the bank (the $2,000 paid to Rhoads and the $9,913.68 paid for the annuity) and consequent reduction of the amount now collectible by the trustees on the assignment. Appellees contend (1) that the $2,000 payment to Rhoads was a valid brokerage fee and in the absence of prior agreement to pay part of it to the bank, the voluntary payment by Rhoads was irrelevant in this proceeding; (2) that, if regarded as a payment to the bank, it was a valid underwriter's commission; (3) that, even if the two items were usurious, they were "paid" and not "reserved" by the bank under the federal act, and hence can be recovered only in a separate suit; (4) that in any event the bonds were negotiable; (5) and that therefore the defense of usury is not available against Lessig, a holder in due course.

Considering first the question of whether there was usury and, if so, its effect, if any, in this proceeding, it

is to be noted that, as the bank was a national bank, the Act of Congress controls: *Haseltine v. Central Bank of Springfield (No. 2)*, 183 U. S. 132; *McCollum v. Hamilton Nat. Bank*, 303 U. S. 245. R. S. section 5197, 12 USCA section 85, provides: "Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State . . . where the bank is located, . . . and no more. . . ." The legal rate in Pennsylvania is 6%. R. S. section 5198, 12 USCA section 86, provides: "The taking, receiving, reserving, or charging a rate of interest greater than is allowed by the preceding section, when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. In case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover back, in an action in the nature of an action of debt, twice the amount of the interest thus paid from the association taking or receiving the same: *Provided,* That such action is commenced within two years from the time the usurious transaction occurred." In considering the statute, in *Barnet v. National Bank,* 98 U. S. 555, 558, the court said: "Two categories are thus defined, and the consequences denounced:

"1. Where illegal interest has been knowingly stipulated for, but not paid, there only the sum lent without interest can be recovered.

"2. Where such illegal interest has been paid, then twice the amount so paid can be recovered in a penal action of debt or suit in the nature of such action against the offending bank, brought by the persons paying the same or their legal representatives. . . .

"Where a statute creates a new right or offence, and provides a specific remedy or punishment, they alone apply. Such provisions are exclusive. *Farmers' & Me-*

*chanics' Nat. Bank v. Dearing,* 91 U. S. 29." See also *Haseltine v. Central Bk. of Springfield (No. 2),* 183 U. S. 132, 135; *Talbot v. Sioux City Nat. Bank,* 185 U. S. 172; *McCollum v. Hamilton Nat. Bk.,* 303 U. S. 245.

We may note, in passing, that on this question of usury the appellant has changed his ground, or has increased his claim over what he claimed in the petition for the citation. In the sixth paragraph, he had asserted that the trustees were "not entitled to any amount in distribution of this estate greater than the amount actually paid to your petitioner, together with such amount as may properly and reasonably have been paid for the purchase of an annuity which would provide for regular payments of interest upon his bonds, and less interest, from the time they withheld the same, on the amounts they unlawfully withheld from your petitioner." His argument now is that the payment for the annuity was a reservation within the first of the two categories quoted from *Barnet v. National Bank,* 98 U. S. 555, and that the payment of $2,000 to Rhoads was in the same class. Both amounts, it is said, were "reserved" by the bank from the loan to appellant with the result that the bank in fact only loaned the difference between $20,000 and the total of the two sums (slightly less than $12,000) which the appellant paid to the insurance company and to Rhoads.

We shall deal first with the sums expended for the annuity. By the bond, appellant agreed to pay principal and interest as stated in it. The bond referred to the deed of trust providing security and for its enforcement; it particularly provided that the interest payable was also secured by an annuity policy. The agreement of facts states that provision for the annuity was made in the Chatham Discount Company's letter of August 17th, nearly a month before the bank was applied to, and that on August 20th, appellant agreed to provide the annuity. The cost of the annuity, $9,913.68, was paid by the appellant to the insurance company with part of

the money he had borrowed from the bank; but that was not a reservation by the bank. The situation is not, as appears to have been suggested in the argument, like the discount by a bank, of a note at the legal rate plus a commission, in which case the bank on its books credits the borrower with the amount of the note less the interest and the commission, thus paying him only the difference, thereby, in fact, reserving part of the principal of the note; in such case, as GIBSON, C. J., said, in the case referred to in the brief, *Oyster v. Longnecker,* 16 Pa. 269, 274, "A return of part of the sum on which interest is reserved, reduces the contract essentially to a loan of the residue." Here the bank retained no part of the cost of the annuity. Appellant, as he had agreed to do, paid the insurance company to secure the payment of the interest; in other words, he went into the market and purchased an interest-payer. We agree with what had apparently been appellant's view when he drafted the petition for the citation, that the amount paid by him to the insurance company cannot be regarded as a reservation within the Act of Congress. This element of the transaction is therefore not within the first category stated by the Supreme Court; we need not now decide whether it is within the second, because the question is not before us, for, as the cases cited hold, the Act of Congress provides the sole remedy.

Appellant contends that the receipt by the bank of $1990 from Rhoads out of the $2000 paid to him as commission for the sale of the bonds when in fact he did not sell them, constitutes a reservation by the bank within the meaning of the Act of Congress of part of the loan made to appellant and brings the transaction within the first of the two classes stated in *Barnet v. National Bank,* 98 U. S. 555. The point is not free from difficulty because the evidence is meager. Rhoads was dead at the time of the trial. One of the conditions under which the bank made the loan was that Rhoads should receive $2,000 for the purpose specified. The bank's vice presi-

dent testified: "Q. You have said that you think Mr. Queal engaged Mr. Rhoads. Was Mr. Queal in other transactions that your bank had in estate loans? A. Yes, he was. Q. About how many? A. Maybe a dozen or more. Q. Did he in any of those represent the bank? A. No, sir. Q. How often was Rhoads the broker in these estate loan transactions? A. Frequently. Q. Frequently? A. Yes, sir. Q. You never took the brokerage fees direct yourself? A. No. Q. And Queal and Rhoads had been in many transactions with your bank? A. A number. Q. Can you think of any other instance in an estate loan transaction or bond issue where Mr. Rhoads turned over the commission to the bank? A. Never the entire commission, no sir. Q. How many times did he turn over a part of it? A. Well, I would say in most instances. Q. In most instances? A. Yes."

Mr. Lessig testified that he received and paid for the bonds on September 15th, the day after they were issued; the stipulation of facts states that the sale was made on the 16th. Mr. Lessig also stated that he had bought bonds from the bank for "a good many years"; at the time of the purchase he had no interest in the bank but was "a competitor." He was asked in cross-examination, "Q. When did you first have a talk with Mr. Storb about these bonds? A. The chances are about a day prior; that is the way we generally bought and sold bonds; if he would tell me he had something good one day, why, the chances are I would go into the bank the following day, if I cared to buy the bonds, and buy them. Q. Did you know at that time that he was getting the bonds that day? A. He offered the bonds to me—sold them to me; I took it for granted he had the bonds, which apparently he did have, because I never buy a bond and give a check for them unless that bond is delivered to me, at the time I give my check."

As there is nothing to suggest that the bank was claiming an underwriter's commission or any evidence on which such claim could be based, we do not consider

questions that might have arisen if such a claim had been made. Compare *Lubbock Hotel Co. v. Guaranty Bank & Trust Co.,* 77 F. (2d) 152 (C. C. A. 5th, 1935) with *Stirling v. Gogebic Lumber Co.,* 165 Mich. 498, 131 N. W. 109 (1911).

We think the evidence that the bank received $1990 in the circumstances stated justifies the conclusion that its receipt was usurious as a reservation by the bank within the terms of the National Banking Act. The fact must be determined by the substance of the transaction: *Simpson v. Penn Discount Corp.,* 335 Pa. 172, 5 A. (2d) 796, and cases cited p. 176. If, therefore, instead of selling the bonds, the bank had retained them and now claimed as owner instead of as one of the trustees, the $1990 item might be deductible. But appellant is met with the appellee's argument that the bonds are negotiable and that usury is not available against the real claimant, a holder in due course.

It is unnecessary to decide in this case whether so-called bearer bonds, to be negotiable, must conform to the Uniform Negotiable Instruments Law,[4] but we shall deal with appellant's argument on the assumption that they must, leaving the point for decision when necessary. We also think, in the interest of uniformity in an important commercial field, that we should apply the same principles applied to transactions of the same general character by the courts in states of large commercial activity and shall refer to cases from such states supporting the conclusion we have reached.

The statute (1901 P. L. 194, 56 PS section 1) provides in section 1 that "An instrument to be negotiable must conform to the following requirements", specifying them. It was said in *International Finance Corporation v. Phila. Wholesale Drug Co.,* 312 Pa. 280, 283, 167 A.

---

[4] In *Dengler v. Paul,* 83 Pa. Superior Ct. 37, conformity with the Negotiable Instruments Law was not discussed. Negotiability was assumed; the bond may have been negotiable under the law merchant if not under the Negotiable Instruments Law.

790, that doubt or uncertainty as to negotiability should be resolved in favor of negotiability. In *Enoch v. Brandon*, 249 N. Y. 263, 164 N. E. 45, 47 (1928), the court said: "We must consider the instrument as a whole, not wresting any one phrase from its context and concentrating our attention upon it alone. Further, where the meaning is doubtful, we must adopt the construction most favorable to the bondholder." In *Sturgis National Bank v. Harris Trust & Savings Bank*, 351 Ill. 465, 184 N. E. 589 (1933), the court applied the same rule of construction.

By each bond [5] appellant promised to pay bearer $1,000 at the bank's office September 1, 1956, "or before said date as prescribed in the deed of trust securing these bonds, with interest. . . ." The second paragraph provided that the bond was one of a series of 20 "secured by deed of trust bearing even date herewith, executed by me," reciting the assignment of his interest in his father's estate as security.

The third paragraph provided that the interest on the bonds was "secured by an annuity policy issued. . . ." on the life of appellant's mother, "yielding a sum sufficient to pay the interest on the bonds, payable semi-annually on the 28th day of February and the 28th day of August in each year after date, until and including

---

[5] "KNOW ALL MEN BY THESE PRESENTS, that I, EMIL GERBER, JR., of Silver Spring, State of Maryland, am held and firmly bound unto the bearer hereof in the sum of One thousand dollars ($1,000.00), which sum I promise to pay to said bearer . . . at the office of the National Iron Bank, of Pottstown, Pennsylvania, on the first day of September, 1956, or before said date as prescribed in the deed of trust securing these bonds, with interest at the rate of six per cent (6%) per annum, payable at said office . . . on the first day of the months of March and September of each year until the full payment of the principal of this bond, all of which payments well and truly to be made I do firmly bind and obligate myself, my heirs, executors and administrators by these presents. The said interest shall be payable to the bearer of the annexed coupons upon presentation and surrender thereof as they shall respectively mature."

the interest date immediately preceding the death of the said Caroline Gerber."

The fourth paragraph was as follows: "This bond shall mature and become due on September 1, 1956, except as otherwise provided herein and in the deed of trust securing this issue of bonds. It shall mature and become due prior to September 1, 1956, on the next interest payment date succeeding a period of thirty (30) days after the death of Caroline Gerber, the mother of the obligor."

The eighth paragraph provided, "This bond is issued and held subject to the terms and conditions of said deed of trust to The National Iron Bank, of Pottstown, Pennsylvania, and Edward J. Storb, trustees, and shall not become obligatory until signed by me and authenticated by the certificate of the trustees thereunder endorsed hereon, duly signed by the proper officer of The National Iron Bank, of Pottstown, Pennsylvania, and Edward J. Storb."

Whether the bond is negotiable must be determined by what it says and without resort to instruments not attached to it. Section 52, 56 PS section 132, provides that to be negotiable it must appear that the instrument "is complete and regular upon its face". Appellant makes two points in support of his contention of non-negotiability. The first is made by reconstructing the context of the 4th paragraph, quoted above, providing maturity September 1, 1956, "except as otherwise provided herein and in the deed of trust securing this issue of bonds. It shall mature and become due prior to September 1st, 1956, on the next interest payment date succeeding a period of thirty (30) days after the death of Caroline Gerber, the mother of the obligor." We think the intention was to provide that the bonds should be matured by the death of appellant's mother prior to September 1, 1956, and that the intention is expressed in the language quoted. Appellant would reach a different conclusion by suggesting that it pro-

vides three maturity dates, the first, September 1, 1956; the second, determined by the death of appellant's mother and third, by lifting from its context the words "and in the deed of trust securing this issue of bonds", an undeterminable date. We must reject that interpretation; we think the words providing for maturity by the death of appellant's mother were intended to be explanatory of the words "and in the deed of trust securing this issue of bonds" and that they were not intended to suggest a third maturity date. The ambiguity, such as there is, must be determined, as was said in one of the cases referred to above, by a "construction most favorable to the bondholder."

Appellant's second contention that the bonds were not negotiable is based on words, also taken from their context, in the 8th paragraph of the bond, which states that the bonds are issued and held subject to the terms of the deed of trust and that they shall not become obligatory until signed by the appellant and authenticated by the trustees. We think that, properly understood, the provision related to the identification of the security and was intended to enable the prospective purchaser to ascertain by examining the bond whether the trustee had certified that it was one of the bonds entitled to the security. Here again the rule must be applied that doubt must be resolved in favor of negotiability.

In *Enoch v. Brandon,* 249 N. Y. 263, 164 N. E. 45, 47 (1928), the second of the cases quoted above, the court said: "The bonds are part of an issue of $7,500,000, 'all equally secured by and entitled to the benefits and subject to the provisions' of the trust mortgage. Then, speaking of possible redemption, of acceleration of payment, of a sinking fund, and of notice, it continues: 'All as provided' in the trust mortgage, 'to which reference is hereby made for a description of the property mortgaged and pledged, the nature and extent of the security, the rights of the holders of the bonds with

respect thereto, the manner in which notice may be given to such holders, and the terms and conditions under which said bonds are issued and secured.'

"We hold that here there is no modification of the promise to pay, made in explicit terms. The provisions all have to do with the trust mortgage. They refer to the rights conferred by it upon the bondholders and limit and explain those rights. They are so linked together as to indicate that the obligor was speaking solely of the security. A purchaser, scanning the bonds, would have the same thought. It would never occur to him that, when November 1, 1941, arrived, because of something contained in the mortgage he might be unable to collect the amount due him. He would interpret the statement that the bonds were secured by, and entitled to the benefits and subject to the provisions of, the mortgage, as meaning that a foreclosure or other relief might be had thereunder only subject to its provisions. He would see that reference to it is also made to determine the terms and conditions under which the bonds are issued and secured. Again, it would mean to him, as it means to us, that only by turning to the mortgage might he discover the precise nature of the lien he is to obtain. He would see that the bonds were to be issued, not only upon the general credit of the corporation, but upon the faith of some collateral mortgage. To it he must go, if further knowledge as to this security is desired.

"Some minor matters are also to be considered. There is the possibility of the acceleration of the date when the bonds are due, if there is default under the mortgage. Such a possibility does not make them non-negotiable [citing cases]. A note is payable at a determinable future time, if payable on or before a fixed date. Section 23. And in one case acceleration of payment in case of default is expressly recognized. Section 21. The same thing is true of the privilege given the obligor to redeem at 105 per cent. before the bonds

became due. That does not limit its absolute promise to pay on November 1, 1941."

In *Sturgis National Bank v. Harris Trust & Savings Bank*, 351 Ill. 465, 184 N. E. 589 (1933), the third of the cases referred to above, an action in trover for stolen bonds in the hands of a holder in due course, the bond provided that it was one of a series "entitled to the benefits and subject to the provisions of a mortgage or deed of trust . . ." It also provided the obligor was required to create a sinking fund and that the principal might become due in case of default "all as provided in said mortgage or deed of trust, to which reference is made for a complete statement." It was contended that the provision made "it necessary for the holder of the bond to look to another instrument to learn what the obligations of the issuing company and his rights as holder of the bond are, and therefore the bonds are not unconditional and so are not negotiable." After referring to many cases on the subject, the court concluded that the challenged language did not make the bonds non-negotiable but had reference entirely to the security. The same conclusion was reached in *Paepcke v. Paine*, 253 Mich. 636, 235 N. W. 871 (1931). The bonds, after reciting that they were part of a larger issue, said "reference is hereby made for a statement of the terms under which the said Debentures are issued and the rights and obligations of the Company, of the Trustee and of the respective holders of the said Debentures under the said Trust Agreement. To the extent provided in the said Trust Agreement all rights of action upon this Debenture are vested in the Trustee."

The purpose of such provisions is to advise purchasers where they may ascertain the nature and kind of the security pledged for the payment of the bond and of the procedure available to enforce the security. They do not require the prospective purchaser to examine the deed of trust to ascertain whether the bonds, com-

plete on their face and apparently negotiable, are in fact made conditional by another instrument. It is this feature of the bonds in the case at bar, as well as in those just referred to, which distinguishes this case from those relied on by appellant in his argument. The case most stressed is *King Cattle Co. v. Joseph,* 158 Minn. 481, 198 N. W. 798 (1924), aff'd on re-argument, 158 Minn. 488, 199 N. W. 437 (1924). In that case the bond contained a clause stating that all the bonds "are to be issued, under and in pursuance of, and are all equally secured by, and are subject to an indenture of mortgage or deed of trust, dated September fifteenth, 1920, duly executed by the company to said Yellowstone Bank and Trust Company, of Sidney, Montana, as trustee, under which indenture all of the property of the company, real, personal and mixed, now owned or hereafter acquired, has been transferred and mortgaged to said trustee and hereby reference is made to said indenture and the same made a part hereof, with the same effect as if herein fully set forth." It will be noticed that the deed of trust was made a part of the bond, a fact not present in the bonds before us, or in the other cases referred to above. The court distinguished the cases generally arising under section 3 of the Negotiable Instruments Acts, 56 PS section 3, providing that "A statement of the transaction which gives rise to the instrument" does not qualify an otherwise unqualified promise, by saying: "We see no escape from the conclusion that the language of these bonds goes far beyond a mere reference to the underlying security. The parties evidently intended to incorporate and include the provisions of the trust deed in the bonds. They wrote into them a notice to an intending purchaser that, in determining the nature of the obligation of the maker, he could not stop with a reading of the bonds, but must also read the trust deed, for the conditions of the trust deed were impressed upon them. In one sense the bonds were incomplete, not because they were

unfilled blanks or omissions to be supplied, for there were none, but because on their face the bonds carried notice that the entire contract of the parties was not expressed. It was necessary to look to a separate instrument to be certain as to when and how the maker of the bonds could be compelled to pay them." Another case relied on by appellant is *Fayetteville B. & L. v. Crouch,* 115 W. Va. 651, 177 S. E. 532 (1934). In this case, again, it was necessary to examine other instruments to ascertain the extent of the primary obligation. The third case, *People v. Gould,* 347 Ill. 298, 179 N. E. 848 (1932), arose on the sufficiency of an indictment. We see no support for appellant's argument in that case. The law of Illinois on the point with which we must deal appears very clearly in the subsequently decided case, already quoted from, *Sturgis National Bank v. Harris Trust & Savings Bank,* 351 Ill. 465, 184 N. E. 589 (1933). We must therefore conclude that the bonds were negotiable.

The appellant, however, apparently realized that the bonds might be held negotiable and, accordingly, has submitted a contention that even if negotiable, the holder in due course[6] could only take them subject to the defense of usury; to support this contention, he says the usurious contract is void. We cannot accept this contention.

The National Banking Act "does not declare the contract, under which the usurious interest is paid, to be void."[7] *Oates v. National Bank,* 100 U. S. 239, 250.

---

[6] The record shows that Lessig was a holder in due course. Section 52, 56 PS section 132, provides: "A holder in due course is a holder who has taken the instrument under the following conditions: . . . (4) That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

[7] In Pennsylvania usury is not unlawful though the Act of May 28, 1858, P. L. 622, 41 PS section 4, in cases to which it applies, prohibits the recovery of the excess over the legal rate, *"Provided always,* That nothing in this act shall affect the holders of nego-

128

Neither does it, as appellant contends, destroy the interest-bearing power of the note, for in *Talbot v. Sioux City First National Bank*, 185 U. S. 172, at 181, the court said: "It is the interest charged, not the interest to which a forfeiture might be enforced, that the statute regards as illegal. And a forfeiture may or may not occur. Interest greater than the legal rate may be charged, but it may be relinquished and recovery be had of the legal rate." See also *Brown v. Marion National Bank*, 169 U. S. 416, 420. The act merely provides certain penalties and forfeitures for its violation. Lessig is a holder in due course under section 52. The defense set up by appellant is clearly precluded in this action by section 57, 56 PS section 137, which provides: "A holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon." See the discussion, with reference to cases, in Brannan's Negotiable Instruments Law (5th ed. 1932) p. 553 et seq.; Notes, 5 A. L. R. 1447 (1920) ; 95 A. L. R. 735 (1935).

The claim was presented at the audit by the trustees under the deed of trust. They act for the beneficiary under the deed. The sole beneficiary is a holder in due course.

Decree affirmed at appellant's costs.

---

tiable paper, taken *bona fide* in the usual course of business." The contract is not void but voidable: *Eichleay v. Antonoplos*, 309 Pa. 411, 417, 164 A. 343.

By the Act of April 18, 1929, P. L. 620, 41 PS section 1, parties may stipulate for any rate of interest for collateral loans in excess of $5,000 secured by negotiable instruments. By the Act of May 8, 1929, P. L. 1647, 41 PS section 2, corporations cannot plead usury.